Hyman Korn, J.
Blanche Haskell, hereafter referred to as “ respondent” moves to confirm the Referee’s report wherein he found a certain release of a power of appointment by the late Amory Haskell to be invalid.
Petitioner and other children of Amory Haskell cross-move to disaffirm the report.
This controversy arises during the course of an accounting proceeding in which petitioner, as sole surviving trustee of an inter vivos trust created by Margaret Haskell for the benefit of her son Amory, seeks approval of her final account and requests the court to direct to which persons the remaining trust corpus be paid.
Essentially, this is a contest between Amory’s second wife, respondent Blanche Haskell, and Amory’s children from his first marriage. The determination as to which persons will- take the trust principal will turn on whether or not the power of appointment granted under his mother’s trust was effectively released by an instrument executed by Amory in October, 1942.
The trust herein was created by Margaret Haskell in 1935. *799 By its terms the settlor’s son, Amory, was to receive the income during his lifetime and upon his death the trustees “ shall pay over # * * the entire principal # * * to such person or persons * * * said son shall in and by his last will and testament direct and appoint * * * and in default of such appointment * * * deliver the same unto the lawful issue then living of trustor’s said son * * * and in default of such appointment by will and of such lawful issue then unto trustor’s issue then living.” Margaret Haskell and Amory Haskell were named as trustees, and on the death of one, the survivor was “ authorized and empowered ” to appoint a successor cotrustee. Margaret and Amory acted as cotrustees until Margaret’s death on September 17, 1942. After his mother’s death, Amory continued as sole trustee until 1948, when he designated his daughter Anne, petitioner herein, as his cotrustee. On October 29, 1942 (shortly following his mother’s death) Amory on advice of counsel executed the document which purports to release the power of appointment granted him under his mother’s trust.
In 1957, in the petition filed in an interim accounting had herein, Amory recited the fact that he had released the power in 1942 and that his children were the persons interested in the trust remainder. The release executed in 1942 was found among Amory’s personal papers after his death in 1966.
On his death, Amory left a 1961 will under which respondent, Blanche Haskell was made sole beneficiary. While this will contains no specific reference to the power of appointment, the law is quite clear that in the event the release in this case is held invalid, the power will be deemed executed under the general residuary clause of Amory’s will, and Blanche will receive the corpus of this trust. (Matter of Deane, 4 N Y 2d 326; Personal Property Law, § 18 [now EPTL 10-6.1], subd. [a], par. [4]). Thus, the court’s finding with respect to the validity of the release will be dispositive of this proceeding.
The court has considered the arguments and briefs addressed by learned counsel to the questions raised. In addition, the court has examined the authorities and findings submitted by the Referee in his extensive and comprehensive report.
Any determination with respect to the validity of Amory’s release must first start with an inquiry into the nature of the law relating to release of powers as it existed in our State at the time the document in question was executed.
The power granted Amory under his mother’s trust was a general power or power in gross. New York has long recognized that a donee of such power may "by written instrument *800 release his right to appoint (Merrill v. Lynch, 173 Misc. 39), and once executed the release is irrevocable (Manville v. Dresselhuys, 181 Misc. 290).
However, beyond some general discussion relative to voluntary extinguishment of powers, there appears to be a dearth of authority on the issue as to what formalities must attend the execution of a .release other than its mere signing.
By formalities we mean what other acts, if any, must be performed by the donee to manifest his intent to divest himself of the power. Respondent contends that an executed release will not take effect unless it is delivered to some third person, and that, in this case, no such proper delivery was made.
At the time the release was prepared, and signed, there was an absence of any statutory provision specifically setting forth the manner in which the extinguishment of a power could be effected. The claim, however, is made that section 183 of the Real Property Law (now EPTL 10-9.2), enacted April 14,1943, and made retroactive to July 1, 1942, applies and governs here. This section sets forth with particularity the rules governing release of powers and the manner in which delivery must be made.
However, retroactive application of this statute so as to make it the sole standard by which to judge the efficacy of the release in this case would be manifestly unjust. Certainly, Amory and his attorneys .should not be charged with complying with a statute in October, 1942, that had not then as yet come into existence.
Absent, therefore, any sole controlling legislative enactment, the common law would govern.
While there appears to be no authority in the State specifically indicating whether or not, at common law, delivery was required to effect a release, in every case where a release was held valid there was, in fact, some delivery made of the releasing instrument. In addition, the text authorities appear to hold such delivery to be necessary (see Restatement, Property [vol. 3], § 336; Release of Powers of Appointment [Nossaman], 56 Harv. L. Rev. 757, 771 [1943]; 2 Simes and Smith, Law of Future Interests [2d ed.], § 1059).
To a great extent a release of a power of appointment works as a conveyance or transfer of an interest in property to the persons who take on default of the exercise of the power. (Restatement, Property [supra], [see, also, Stiebel v. Grosberg, 202 N. Y. 266, 270].) It is the opinion of the court that the same reasoning which mandates a delivery in cases involving *801 conveyances and gifts would be applicable in cases of release. Delivery represents strong concrete evidence that the releasing donee intends to part with his power to appoint. He has, in effect, declared to the world such intention. England, both at common law and under the Conveyancing Acts treats a-release of a power as a conveyance and required a deed be given by the releasing donee. (Conveyancing and Law of Property Act, 1881, ch. 41; see Farwell, Powers [3d ed.], p. 21.)
A further aid in resolving the question of delivery may be had in examining section 183 of the Beal Property Law. True it is that Amory was not bound by this statute, still to a great extent it apparently codified what in the Legislature’s minds were the requirements at common law, and a reading of the section clearly indicates that delivery was such a requirement. It should also be noted that Amory’s attorneys believed that some act of delivery had to be carried out. Their correspondence clearly shows an attempt to specifically spell out a transfer from Amory, the donee, to Amory the trustee. The court, therefore, determines that delivery of the release in this case was essential to the extinguishment of the power. Of course, the question which next presents itself is whether Amory did, in fact, make delivery in the manner required at common law. Bespondent, seeking to defeat the effect of the release, contends that Amory’s act in transferring the release to himself as trustee via his attorney was not the act of delivery contemplated under the common law. The contention being that delivery in this case had to be made to a party whose interest was adverse to his, to wit, one who would take on default of the exercise of the power (citing “ Release of Powers of Appointment ” [Nossaman], supra, pp. 770-771). In order to resolve this issue it would be well to consider the circumstances which prompted this release and the choice of action open to Amory.
At the time Margaret Haskell created this trust, the Federal tax law was such that, unless a power to appoint was in fact exercised, the corpus passing on the death of the donee would not be taxable in the donee’s estate. In 1942, the law was changed so that in this case whether or not Amory exercised the power in his will, had he died in 1942, the corpus passing on his death would have been taxable in his own estate, rather than his mother’s. Amory’s lawyers notified him of the new law, and it was agreed that to avoid further estate taxes, Amory should release his power.
In order to accomplish this purpose, the attorneys prepared the necessary release document and forwarded several copies *802 to him, which he was to sign and return to them. This he did, and his attorney, in turn, returned the signed copies to him with a letter indicating that the “ original is sent to you as trustee and delivered to you as trustee in behalf of all remaindermen interested in the trust.” Amory acknowledged receipt of the release qua trustee.
It cannot be doubted that Amory and his counsel contemplated a bona fide release of the power. Certainly, this was not a secret transaction. The formal exchange of letters setting forth the method of release was obviously done in an attempt to publicly document the release.
The fact that Amory acted openly and under the assumption that he had irrevocably extinguished the power is further evidenced by the fact that, more than 15 years later, in the 1957 accounting, he again recites, and this time to the court, the fact that the power was released in 1942.
The “ adverse party ” in this case to whom respondent would have required delivery be made were donee’s own minor children. Mandating physical delivery to these children under the circumstances of this case, or to some stranger, would Save been far from practicable. The law recognizes that a parent and natural guardian is the obvious party to be entrusted with a minor’s property (Brown, Personal Property, § 45, p. 105). Furthermore, in transactions between parent and child, where some benefit is intended, the same formalities with respect to delivery which apply between strangers do not apply (Brown, Personal Property, § 45; Brinckerhoff v. Lawrence, 2 Sandf. Ch. 400; Scrugham v. Wood, 15 Wend. 545; see, also, “ Delivery Without Manual Transfer ”, Ann. 129 A. L. R. 11, 21), and this is so particularly where there has been some overt declaration to manifest such intent (Matter of Tummonds, 158 Misc. 592).
Respondent, however, contends that Amory’s release of the power was not intended to benefit his children but solely motivated by tax considerations. True it is that Amory acted when he did because of the then change in the tax law; still the persons who would benefit by the release were his children, the default takers under the trust.
Amory knew that when he released the power, his surviving children would become vested with the trust principal at his death. His attorneys’ letter of October 31, 1942 specifically states, referring to the release, that he “may hold it for his children, who are * * * now interested in the remainder of the trust.”
*803 By releasing the power, he as effectively conveyed the corpus to his surviving children as if he had specifically appointed them as remaindermen in his will. Furthermore, through this release they would have the advantage of receiving the corpus unburdened by additional taxes.
It is therefore apparent that the sole purpose for Amory’s releasing the power in October, 1942 was to preserve for his children as much of his mother’s trust corpus as he could.
However, there is an additional factor which permits Amory to receive delivery of the release for his children — that being the fact that he was also a trustee of the corpus with which the release was concerned. As such, he would have been the proper party to receive delivery of any release relating to the trust (Central Hanover Bank & Trust Co. v. Hutchinson, 22 N. J. Super. 78), this both at common law and under section 183 (subd. 3, par. [b]) of the Real Property Law, which respondent contends governs this case.
Respondent, however, would prohibit Amory from acting in the dual role of donee and trustee. That is, it is contended he could not make delivery to himself.
The law does recognize that a person may act in two capacities in the same transaction; the best example being the case of a person who creates a trust by conveying to himself as trustee. No physical delivery actually takes place — the law implies one. The only requirement in such a case is that the .settlor make some declaration of his intent.
In this case Amory clearly manifested and declared his intent to extinguish the power, both in his correspondence with his attorneys and in the 1957 interim accounting proceedings.
Respondent further contests Amory’.s right to accept delivery as trustee, contending that the trust terminated on Margaret Haskell’s death. This contention is based on the theory that on his mother’s death, Amory became both sole trustee and beneficiary, resulting, by operation of law, in a merger and creation in Amory of a legal life estate (Matter of Reed v. Browne, 295 N. Y. 184).
The court under the facts of this case finds no such merger.
Where the same person is both beneficiary and sole trustee, the law will not work a merger where it is shown the settlor intended otherwise (Matter of Phipps, 2 N Y 2d 105).
In this case the court finds such contrary intent expressed in the trust indenture. Paragraph “Eleventh” specifically “ authorizes ” an appointment of a successor trustee where ‘ ‘ there shall at any time and for any reason be only one acting trustee ”.
*804 It is apparent that this provision was placed in the trust instrument by the settlor to prevent the merger respondent seeks to invoke. The court finds this provision to be mandatory, rather than permissive, and indicative of settlor’s intention to have the trust continue after her death.
In addition, paragraph ‘ ‘ Second ’ ’ of the trust provides for addition to the corpus by the settlor “ or by any other person ”. Thus it was contemplated that persons other than the settlor might add to the trust principal, impliedly indicating that the trust continue after her death so that it might continue to receive such increment.
Of course, the court in making its determination in this case does not rest its opinion solely on whether or not a merger may or may not have resulted here. There is no doubt that Amory intended that his children receive the corpus after his death. In executing the release, he followed the procedure set forth by his lawyer. They, in turn, acted as best they could under a common-law rule which was far from being clearly defined. Amory thought he had accomplished this and so stated in his letters to his lawyers and the 1957 accounting. No doubt in drafting his will in 1961 and setting up his estate, he acted under that assumption. Although no such specific mention is made in his will with respect to the power of appointment, he does state that his children are “ amply provided for by various trust funds ”. True it is that this statement is somewhat equivocal; still, when viewed in light of all the circumstances in this case, to hold the release in this case to be invalid would certainly subject the property to tax assessments never contemplated and would give to respondent a windfall which it was never intended she have.
For the foregoing reasons, the court finds as follows:
(1) that the instrument executed by Amory Haskell on October 24, 1942 validly released and extinguished the power of appointment granted under the Margaret Haskell trust indenture dated December 5, 1935;
(2) that upon termination of the trust and discharge of the petitioner herein, the trust principal remaining be paid over to the surviving issue of Amory Haskell;
(3) that the final account filed herein by petitioner, Anne Haskell, is hereby in all other respects approved.
Fees and allowances will be considered and fixed at the time of settlement of the judgment.